He's the court. My name is Greg Wallace and I represent Angela Pemberton in this appeal. My apologies to the court for a delayed entry today. I had another argument over in Division 4. This case doesn't involve big corporations or the Constitution, but it is very important to a single lady, Ms. Angela Pemberton. The narrow issue before the court in this appeal is whether substantial evidence on the record as a whole supports the ALJ's finding that Ms. Pemberton can engage in frequent handling and fingering. In other words, can she use her hands for gross or fine manipulation up to two-thirds of a normal work day, five days a week. Now both jobs... I want to ask a preliminary question. I'm sure you've thought of it. What is the earliest evidence that benefits can be awarded if your client was not disabled until the February 2017 arm surgery? It depends on... Well after the... It depends... On the... Yes, yes. Obviously her claim for disability is based on the combination of impairments and the ALJ would have to decide at what point the combination of her impairments rendered her disabled. It's quite possible that that would be at a time in February, late in her or at least after her onset date, her claimed onset date in that regard. But she still could, as long as it's prior to the ALJ's decision, she still could collect benefits after a certain waiting period. Now the importance of this question about how much can she use her hands on a job makes a difference in this case because the two jobs that the ALJ found that she could do require frequent handling and fingering. If the ALJ's decision is not supported by substantial evidence that would cancel out those jobs. It would also... Limitations on handling and most sedentary jobs requires use of one's hands. So in the fall of 2016, Ms. Pemberton began having problems with elbow pain and numbness. She underwent ulnar nerve surgery in January of 2017, but she continues to have pain and neuropathy in her right hand and arm. Now we're not arguing that her manipulative limitations are disabling in and of themselves, although Dr. Allen, her treating orthopedic surgeon, did say that in his view, just her manipulations rendered her not employable. But for purposes of our appeal, the only question is whether the ALJ's finding that she can perform frequent handling and fingering is supported by substantial evidence. Dr. Allen, her treating orthopedic surgeon, in May 2017 noted that she had been treated, this was five months after her surgery, noted that she had been treated with medications, physical therapy, surgery. She had not responded to any of that. She had continued neuropathy in her right hand and she was not employable. Now the ALJ rejected Dr. Allen's opinion and went on to find that she could perform frequent handling and fingering. Now to his credit, the ALJ addressed Dr. Allen's opinion and he came up with two reasons for why he discredited it. The first, he said that Dr. Allen's opinion was originated with his nurses and not with him. And that is simply not supported by the records, plainly false. He's the treating provider here. One of the nurses indicated that she was a scribe for Dr. Allen. And the last time I checked, LPNs and RNs in Arkansas don't perform clinical examinations, diagnose patients, and devise treatment plans. This is Dr. Allen's opinion. Well, was he saying that I don't believe that? I believe the LPNs are not supposed to be doing it, but they went beyond the scope of their responsibilities here because that's what the documents show. Well, I don't think, first of all, I don't think the documents show that. I think the documents show that one of the nurses indicated specifically in the document that she was a scribe for Dr. Allen. That's like you calling in your secretary and dictating a letter. She's your scribe. And that letter comes from you. It doesn't come from the secretary simply because she typed up your notes here. The other reason given... And I don't think there's any evidence that explains whether that not considered employable was a temporary or permanent prognostication. We're talking three months, a surgeon's report, status report of the patient three months after surgery. And to me, it's as likely as to have been temporary as permanent. Actually, it was five months after her surgery and... I thought it was May. It was in May and her surgery was in January. Well, it was February 1 or January 31. Well, OK, four months. We'll compromise there. Four months after the surgery. But it's not just the timing. It's what he said. He said that she had been treated with medications, she had undergone physical therapy, and she had undergone surgery, and he said she had not responded to any of that. And I think the question is, what's left then that could make her better? There's no indication on the record that anything is left to make her better there. Now, the ALJ's decision was in September of 2017. So within that time period, at least, it's clear that her condition was... There's no evidence that it would not have been... Would have been simply a temporary condition that she could recover from in just a few months. What's the evidence of that? I'm saying there's no evidence that it was a temporary condition. What's the evidence that she did not have... I mean, taking a year for someone in middle age or later to recover from this kind of surgery is not at all surprising. And if it doesn't take a year, then it's not disabling for Social Security purposes. Well, it either has to lack... What's the evidence that nothing better happened after that document? Well, the evidence is, the medical evidence, is his observation that she had undergone all the different... No, after May. After May. Well, that was the last entrance in the entry in the letter. That was not what the ALJ relied on to... First of all, that was not what the ALJ relied on to... I don't think that's clear. To discount his... Well, he never said that. There was nothing in the opinion that says that. He said, in fact, that not only was the opinion written by our nurses, but he also claimed that the treatment notes showed mild pain with good healing. Now, the commissioner, I think, understands that that's really not supportable by the record because the commissioner, he recharacterizes that to mild tenderness and mild swelling. The commissioner says there's no significant neurological dysfunction in her right upper extremity and no weakness or sensory loss. Well, both of them are wrong, the ALJ and the commissioner. In February the 7th, the pain, Dr. Allen noted that the pain was 410 in the elbow and 7 out of 10 in the wrist. February 14th, pain, tenderness, decreased range of motion. On February 28th, he said she's still having a lot of burning pain at times. March the 21st, pain, 6 out of 10, decreased ROM. Couldn't straighten her elbow and she had pain when opening things. April the 11th, still having a lot of pain. Pain was at 6 on a 10 scale, decreased range of motion. Again, couldn't straighten her elbow. On May 4th, her pain was... She had not responded to treatment. Pain was 6 out of 10. He indicated that she had diffuse weakness, even though the commissioner claims she had no weakness. She had continued neuropathy in her right hand. The incision had healed, of course, but not her pain and her neuropathy. That's the point in this case, that there's simply not evidence that the ALJ had in this case to find that she could engage in frequent, but not constant, handling and fingering. That's a very mild limitation on her manipulative abilities. There's simply not any evidence in the record to support that. Thank you, Your Honor. Thank you. Mr. Williams. Good morning, Your Honor. May it please the court, my name is Morris Williams and I am here on behalf of Andrew Saul, the commissioner of the Social Security Administration. Plaintiff's counsel has correctly stated the issue is whether substantial evidence supports the ALJ's RFC determination that plaintiff can frequently, but not constantly, grasp, handle and finger. As plaintiff's counsel has noted, it is in fact true that that's up to two-thirds, but it's also as little as one-third of an eight-hour workday in terms of how frequent she would have tapped up, grasped, fingered or handled. Just for clarification purposes, that surgery was on February 1, 2017 and the last note that we have, that May 4, 2017 note, so that would be a three-month period between the time that she had that surgery versus when we had the last medical record. In that note, it notes that there is mild swelling, well-healing incision, no instability on her valgus elbow stress test at zero and 30 degrees. She has no pain with this maneuver and she has intact sensation. So we have somewhat of an internally May 4, 2017 and a transcript is 698, I believe, is the back. That's the signature page. Yes, and so if you go back I think a couple of pages, it will give you the full note. That's the part you're reading from before, okay, go ahead. And so there's some internal inconsistency because on one hand he has decided or made an opinion that she is considered unemployable but the actual objective medical evidence says she has mild swelling and well-healing and she has no pain with her maneuvers and she has intact sensation. And not only is that opinion inconsistent internally, it's also inconsistent with some of his office notes from after her surgery, which also indicated she had mild tenderness, mild swelling, well-healing incision, intact sensation. She had no sensory loss and no weakness. And also the day before her last visit to Dr. Allen on May 3, she had a physical therapy session with Martha Carter. And during this session, Ms. Carter noted that she had tingling and numbness that was she also noted that plaintiff tolerated the treatment with minimal complaints of pain and difficulty and she had improved range of motion due to decreased pain, decreased stiffness and increased flexibility. So according to Ms. Carter's notes, one day before she went to Dr. Allen on May 4 for this last visit, it appeared that her physical therapy was actually working and plaintiff actually testified during the hearing that her numbness had gotten better after the surgery and she also testified that she was continuing her physical therapy treatment, which would lead one to believe that based on Dr. Carter's notes, this was helping. And so she was experiencing some level of improvement as it relates to her pain and her elbow symptoms. As far as Dr. Allen's diagnosis, he did diagnose radioocular neuropathy, but I would say his diagnosis was somewhat undermined by plaintiff's own testimony because she testified that neuropathy is numbness and weakness of the nerves and she testified that her numbness had gotten better after the surgery. And also, Ms. Carter had also noted that this numbness had gotten better with rest and so you've got a visit the day before her last visit with Dr. Allen and then you've got plaintiff's own testimony that basically undermines his diagnosis that she is suffering from this neuropathy. And so the commissioner would submit that given the standard of review, which as this court knows, according to Bestic v. Bearhill, the Supreme Court case, the threshold of evidence is not high and it only means such relevant evidence as a reasonable mind might accept is adequate to support a conclusion. And given that standard of review, in light of the objective medical evidence that we have showing mild swelling, mild tenderness, well-healing incision, intact sensation, we've got other medical evidence from Ms. Carter stating she's effectively responding to treatment very well. And then her own testimony is that her numbness is getting better after surgery and she's noted earlier, it appears that her physical therapy has been beneficial to her. And as this court knows, that impairments that are treated, well treated, are not considered to be disabling. And so given that, and also plaintiff's testimony, well not her testimony, but in her function report, she has a list of things that she has alluded that she can do in terms of cooking, driving, playing board games, cleaning, which includes doing laundry and doing dishes. She shops in stores and she also testified that she could lift 15 pounds. And also I think it was March of 2017, she reported during one of her visits to Dr. Allen that she was able to care for her daughter who unfortunately suffered, I think, two broken legs during a soccer, some type of soccer accident. And so given that information along with the objective medical evidence, the commissioner's position is that, and also given the standard of review, that the ALJ's decision is certainly supported by substantial evidence. Now, as I, if I'm reading the ALJ's decision correctly, the hearing was nine days after, eight days after this office... It was the 12th, May 12th. And then the decision was at the end of September of that year. That's correct. And her eligibility ends at the end of this year. I'm not sure, Your Honor, when her eligibility... Her disability eligibility. I'm not sure when her eligibility... So if she was then three months after surgery and it didn't improve for a year, she could file again with an onset date of September 29, the date of the ALJ's decision. Do I understand the regime correctly? I'm not sure, Your Honor. Because she's on... This decision only takes effect, well, Mr. Wallace, I know, I'm sure, knows the answer to that, so. Correct. But if I would not, if it was still unclear whether this was temporary or permanent, inability to recover from impairment, this impairment, that's... The future's not foreclosed beyond the ALJ's decision. Correct. And the commissioner would also add that, you know, as part of this decision, he considered her unemployable, which that's an issue that's reserved to the commissioner in terms of making a determination as to whether she's able to work. And in response to plaintiff's counsel about the characterization of the ALJ's, the reason that he discounted, it's not really clear if he actually used this whole idea about who signed the note as a reason to discount it, because he specifically, he mentioned there is no evidence that Dr. Allen gave his opinion. Well, I know, but beyond that, as I understand the 12-month aspect of social security disability, if she was temporarily disabled by this surgery, she would not have been entitled to benefits until it proved to be at least a 12-month duration. Well, Your Honor, and I submit that I don't think that she was... That's all the ALJ was deciding was that if she was not permanently unemployable. Well, and I don't think she was temporarily disabled or permanently disabled, Your Honor, based... No, I know that, but there's an important difference. Yes, but as I was saying, and I also think, you know, as plaintiff's counsel alluded to about the characterization of mild pain versus another way that he could have put it, and I just mentioned, it's not, it may have been a mistake because three times before throughout this opinion on this same page, he correctly identified the medical evidence as it was mild swelling, and that's found in the first paragraph, the second paragraph, and the third paragraph on page 18. And so I think, at most, it may have been a mistake on his part by saying mild pain because he certainly didn't continue that as a theme throughout his decision.  Thank you. Thank you. Mr. Wallace for a vote, maybe? Have I got it straight on the impact of this decision on possible future rights to benefit? The regulations say that the impairment has to either last for 12 months or to be expected to last for 12 months. So, at this point where the ALJ made his decision, he could have found that this impairment was expected to last for 12 months, and she would have... But that was your position. Yes, exactly, Your Honor. And I think that the best the government can come up with here is that the evidence shows that her incision was healing well and that she had improved, but improved doesn't mean that she can perform frequent reaching and handling at this point, and there's simply no evidence. But if we affirm the district court, she's not precluded from seeking benefits after the date of this ALJ decision. Exactly, you're right. Based on he was wrong about it in concluding she was not expected to last. May I have a moment to answer your question? Yes. The way this would work is that she would probably lose, since you could probably trace her disability back to even prior to the surgery, her pain and numbness that required the surgery. So you're going to talk about... I think October is when she... At least, yes. October through almost September of the next year. So you're really talking about a year's period of time there for which she might lose disability benefits on a second application. And by the way, I'm sorry about the three months thing. When I went to law school, they told me it didn't involve math. So it is three months. Thank you, Your Honor. Very good, Counsel. The case has been well briefed and argued and we'll take it under advisement. Does that conclude?